UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FELIX L. JACKSON,

    Petitioner,

v.

WILLIAM KNIPP, Warden,

    Respondent.

Case No. 11-cv-02201-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Felix L. Jackson, challenging the validity of a judgment obtained against him in state court. Respondent filed an answer to the petition.[1] Petitioner has filed a traverse.

### I. PROCEDURAL HISTORY

On July 17, 2007, an Alameda County jury found petitioner guilty of assault on a peace officer with a semiautomatic firearm (Cal. Penal Code § 245(d)(2)), and three counts of resisting an executive officer (Cal. Penal Code § 69). (Ex. A at 572-75, 579.[2]) The jury found true that petitioner used a firearm in connection with all four counts (Cal. Penal Code §§ 12022.5(a), 12022.53(b)). (Id.) On October 5, 2007, petitioner was sentenced to 17 years in state prison. (Ex. A at 618-19.)

---

[1] Petitioner initially named Anthony Hedgpeth, former warden of Salinas Valley State Prison, as the respondent in this action. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, William Knipp, the current warden of Mule Creek State Prison, where petitioner is currently incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer.

Petitioner directly appealed the judgment in the California Court of Appeal. On January 28, 2010, in a reasoned opinion, the California Court of Appeal affirmed the judgment. (Ex. E.) On May 12, 2010, the California Supreme Court summarily denied the petition for review. (Ex. G.) The instant petition was filed on May 4, 2011.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[3]:

### A.  Prosecution Case

*1. Weight Room Incident*

Approximately 5:00 p.m. on July 19, 2004, Kirk McHenry went to the workout room of his apartment complex located in Hayward. When he entered, he noticed that the room was "really hot"; the air conditioning was off and the windows were closed. The temperature in the room felt close to 100 degrees. [Petitioner] was sitting on one of the machines; his eyes were closed and he was breathing hard. McHenry noticed that [petitioner] was "really sweaty" and his shirt was "drenched" in sweat. When McHenry asked him if he was okay, [petitioner] did not respond. [Petitioner] got up, stumbled, and fell onto all fours. McHenry again asked [petitioner] if he was okay. [Petitioner] did not respond, but started to adjust the weight system. As a result, McHenry assumed [petitioner] was okay and was just having a hard workout.

As McHenry turned his back to plug in his radio, [petitioner] suddenly "rushed" him and slammed him into a wall. When McHenry turned around, [petitioner] started swinging his fists, hitting McHenry twice. McHenry then grabbed [petitioner] by the shirt and forced him to the ground. [Petitioner] hit the ground hard.

McHenry noticed that [petitioner] "just didn't look right," and that he had "a weird look in his eye." McHenry said, " 'Man, what's wrong with you? What's wrong with you?' " [Petitioner] did not respond, but "just started swinging." McHenry defended himself, hitting [petitioner] in the jaw. After hitting [petitioner], McHenry asked him if he was okay. Without any comment, [petitioner] started throwing punches again. After McHenry hit [petitioner] again, [petitioner] stopped struggling and "just laid on the ground." [Petitioner's] eyes were open, looking up with a blank stare.

---

[3] This summary is presumed correct. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

McHenry went to the front office so that the apartment manager could call the police. After McHenry spoke with the 911 operator, he saw [petitioner] walking away from the apartment complex. Worried that [petitioner] was going to jump on the nearby train tracks, McHenry followed [petitioner] and called after him.

*2. Emergency Personnel Arrive at the Scene*

Approximately 5:30 p.m., Hayward Police Officers Mike Donofrio and Rodney Reed were dispatched to Whitman Green Apartments concerning a disturbance of the peace and a battery. Both officers were in uniform and each drove a marked patrol car. About the same time, Fire Captain Mark Bennett and Firefighter Earl Boles were also dispatched to a medical call at the Whitman Green Apartments concerning an "altercation." Although Bennett could not recall whether the call indicated an individual was unconscious, he remembered the call involved a possible head injury. Bennett and Boles arrived at the scene in a fire truck with its lights and sirens activated.

Donofrio and Reed saw the fire truck following [petitioner], who stared straight ahead and continued to walk down the street without ever acknowledging the fire truck's proximity to him. Boles said that [petitioner] was initially staggering down the street.

Reed initially testified that [petitioner] was identified as the unconscious person. He subsequently clarified that although [petitioner] was identified as the person involved in the fight, he did not appear to be unconscious.

*3. [Petitioner] Struggles with Police Officers and Firefighters*

Donofrio walked toward [petitioner]; when he was about 10 feet from [petitioner], Donofrio asked to speak with him. After [petitioner] did not respond, Donofrio said, "Hayward Police. I need to talk to you." [Petitioner] walked past Donofrio with clenched fists, looking straight ahead with a tense look on his face. [Petitioner] never looked at Donofrio, and never acknowledged the fire truck that was following him.

Donofrio then grabbed [petitioner's] wrists, spinning him around so that [petitioner] and Donofrio were facing each other. [Petitioner] bent down as if he was going to lunge at Donofrio. [Petitioner] then "rushed" into Donofrio "like making a tackle." According to Bennett, [petitioner] lunged at Donofrio's firearm. Donofrio responded by placing [petitioner] in a bear hug.

According to Reed, [petitioner] and Donofrio fell to the ground when [petitioner] lunged at Donofrio. Reed then "jumped on the pile," along with the firefighters. Donofrio, however, recalled falling to the ground after Bennett and Boles came up behind him as he had [petitioner] in the bear hug. Bennett remembered that he "bull rushed" [petitioner] and Donofrio, taking "them both down to the ground."

While still in the bear hug, Donofrio fell on top of [petitioner] as both men hit the street; [petitioner] was on the bottom. Bennett put [petitioner] in a head lock. Reed told

3

[petitioner] several times, " '[S]top resisting. Stop. Stop. Stop. Put your hands back.' " At this time, Reed pulled out his baton and started striking [petitioner's] shins. [Petitioner] struggled violently, kicking his legs, but still saying nothing.

During the struggle, Donofrio felt a "tug" on his right side. Donofrio reached down to check for his gun and discovered that it was no longer in the holster. Donofrio called out that [petitioner] had his gun. He then felt an object brushing against his body and then saw the barrel of his gun pointed at his face. Donofrio put his right hand over the barrel of the gun, trying to move it away from his face. He put his left hand in [petitioner's] face, attempting to obscure his view.

Bennett attempted to gain control of the gun. He also tried to remove the gun's magazine. The "gun moved throughout the struggle," and at one point, the gun was pointed at Bennett. Ultimately, Boles pulled [petitioner's] fingers off of the gun, and he gave it to Reed.

*4. [Petitioner's] Demeanor During and After the Struggle*

During the struggle, [petitioner] "wasn't acting appropriately, [and] it appeared he may have been in an altered state ... either as a result of narcotics or intoxication...." Although Donofrio stated that he thought [petitioner] exhibited signs of being under the influence of PCP, the prosecutor stipulated that [petitioner] had no PCP in his system. Bennett thought "[t]here was something definitely wrong with [petitioner]." Boles also mentioned that [petitioner] was "acting different." At some point during the struggle, [petitioner] urinated and defecated on himself. After the struggle, [petitioner] remained on his back; he had his eyes closed and he was nonresponsive.

To determine whether [petitioner] was unconscious, Boles performed an "arm drop" test on [petitioner]. Boles initially recalled that [petitioner] voluntarily moved his arm to avoid hitting his face. Boles, however, could not remember if [petitioner] was handcuffed at the time of the test, but explained that if he had been handcuffed, Boles would have dropped both of [petitioner's] arms. Boles explained that he could not recall whether he administered the test on [petitioner], but his notes indicated that he had done so.

[Petitioner] was taken by ambulance to Eden Hospital. During the ride to the hospital, [petitioner] did not open his eyes and did not answer any questions. At the hospital, [petitioner] opened his eyes and became "[c]ombative, uncooperative, [and] aggressive." The medical staff sedated him.

*5. Search of [Petitioner's] Home*

A search of [petitioner's] home produced the following evidence: (1) a .45-caliber semiautomatic pistol; (2) three magazines; (3) 41 rounds of ammunition; (4) [petitioner's] Fresno County reserve deputy sheriff badge; and (5) [petitioner's] Alameda County Probation Department employee tag. The parties stipulated that [petitioner] previously had been a deputy sheriff.

4

### B.     Defense Case

*1. [Petitioner's] Testimony*

[Petitioner] testified on his own behalf.  At the time of trial, he was taking various "psyche [ *sic* ] medication[s]," including Remeron and Risperidone.  He was raised by his grandmother and had limited contact with his mother.  [Petitioner] attended Fresno State from 1996 to 2001, where he majored in criminology.  During college, he enrolled in an internship program with the Fresno County Sheriff's Department.  After graduation, he became a Fresno County deputy sheriff; he worked in the field and in court.  Following a knee injury, [petitioner] went to work for the Fresno County Probation Department.  He then went to work for the Alameda County Probation Department.

[Petitioner] testified that he could not recall most of what happened in the workout room on July 19, 2004.  He remembered one person attacking him, and then [petitioner] blacked out.  When he came to, he left the workout room and started to walk down the street.  He remembered walking past one police officer, and then being surrounded by a group of police officers and paramedics.  [Petitioner] recalled that one police officer took a step back and hit him.  [Petitioner] tried to defend himself, and then he blacked out again.

[Petitioner] next remembered lying face down on the ground, possibly with his hand on a gun.  His eyes were closed and he heard someone say, " 'He's got my gun.' "  His next memory was of being handcuffed and loaded into an ambulance.  [Petitioner] said that he lost consciousness four or five times that day.  [Petitioner] testified that since the incident, he has had difficulty with his memory.

In May 2005, [petitioner] spoke with John Shields, Ph.D.  [Petitioner] did not recall telling Dr. Shields that he lost consciousness only once on the day of the incident.  He remembered telling Dr. Shields that an officer walked past him and that the officer attacked him; he also remembered telling Dr. Shields that he heard someone say, " 'He has a gun.' "  [Petitioner] also recalled telling Dr. Shields that he "began to realize that they were cops, so [he] stopped resisting, and ... they handcuffed [him]," and they put him in an ambulance.

*2. Psychological Evidence*

Steven Cloutier, Ph.D., a licensed clinical psychologist and expert in psychology, reviewed Dr. Shields's report and [petitioner's] medical records from the jail and hospital.  Just prior to giving his expert testimony, Dr. Cloutier interviewed [petitioner] for approximately 90 minutes.  During this interview, [petitioner] told Dr. Cloutier that he "ha[d] very little memory ... and very little understanding" of the incident with McHenry and the subsequent confrontation with the police.

Following his arrest, [petitioner] was "almost immediately" placed on medication, including Ativan, a tranquilizer, as well as Haldol and Zyprexa, which are antipsychotic medications.  Dr. Cloutier opined that [petitioner] had been suffering from "an ongoing

5

mental disorder of some sort" since the July 19, 2004 incident, which included a suicide attempt and nonresponsive/catatonic behavior.  Based on his interview with [petitioner] and his review of the information he had been provided about [petitioner], Dr. Cloutier thought [petitioner's] behavior on July 19, 2004, was "very out of character."  [Petitioner] told Dr. Cloutier that he had not been in a fight since high school, and "he was unable to explain ... how or why he would have been involved in a fight other than he was scared."

[Petitioner] told Dr. Cloutier that when the police approached him, he was not certain they were police officers; he knew only there was a bunch of people hitting him and knocking him down.  Dr. Cloutier was unaware that [petitioner] had testifed earlier that week that he knew the men were police officers.  Dr. Cloutier explained that the focus of his assessment of [petitioner] was to determine whether his behavior was consistent with suffering blows to the head during an altercation.  He assumed that [petitioner] was knocked unconscious in the workout room; he was not told that McHenry reported [petitioner] was wiping his face and making noises.

Dr. Cloutier defined "unconsciousness" as someone being "knocked out cold," and "impaired awareness" as a state in which someone is not aware of what he or she is doing. Dr. Cloutier believed that [petitioner] had an "impaired awareness of his surroundings" during the incidents on July 19, 2004.  He opined that [petitioner] was "intending to defend himself, and he formed that intent based on a misperception and a mis-awareness [ *sic* ] of events.  And due to his mental state, he did not accurately understand what was going on around him and was not aware that he was not accurately understanding."

*3. Character Witnesses*

Tamara Johnson worked with [petitioner] as an Alameda County probation officer, and she considered him a good friend.  She described [petitioner] as outgoing, hard working and funny.  On July 19, 2004, approximately 3:00 p.m., Johnson spoke with [petitioner]. During this conversation, Johnson observed that [petitioner] was speaking slowly, slurring his words, and was "[n]ot his normal self."  He also seemed tired, but was otherwise coherent.

Toni Eastman, [petitioner's] aunt, helped to raise [petitioner].  She described [petitioner] as being an "[a]verage kid," who never got into trouble.  Eastman was "shocked" by the charges against [petitioner] because such aggressive behavior was contrary to his "easygoing demeanor."

Maxine Jackson, [petitioner's] grandmother, raised [petitioner] since he was a baby.  She described [petitioner] as "pretty easygoing"; he was not an aggressive person.

People v. Jackson, No. A119620, 2010 WL 323074, at *1-5 (Cal. Ct. App. Jan. 28, 2010)

(footnote omitted).

///

6

# III. DISCUSSION

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

7

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed the two claims petitioner raises in the instant petition. The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.      Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) the trial court erred in excluding expert testimony establishing that petitioner was "legally unconscious"; and (2) the conviction under Penal Code § 69 violates the Fourteenth Amendment because the statute "does not apply to firefighters who were not performing a duty or gave a verbal order." (Petition at 6.)

1.      Exclusion of Evidence

The Court of Appeal summarized what occurred at trial with respect to petitioner's request to introduce evidence that, at the time he committed the charged acts, he had been "legally unconscious":

> [Petitioner] moved in limine for admission of mental state evidence to negate the requisite mens rea of counts 1, 2 and 3 (assault), and counts 7 and 8 (exhibiting weapon to resist arrest). The trial court denied the motion regarding counts 1, 2 and 3, on the ground that they were general intent crimes. As to counts 7 and 8, the trial court allowed a limited introduction of mental state evidence.
>
> At the next hearing, the prosecution announced its decision to dismiss counts 7 and 8. In

8

> response, defense counsel renewed his request to introduce mental state evidence as to all remaining counts. Defense counsel argued that "both of those charges [assault and resisting executive officer] seemed to utilize a language that seemed to indicate a specific mental state" that is "akin" to a "specific intent." Rejecting this argument, the trial court ruled that "Counts 1 through 6[ ] are all general intent crimes, and mental state evidence would not be relevant on that issue."
>
> During the trial, defense counsel renewed the motion to admit evidence of [petitioner's] mental illness on four occasions, which the trial court denied. First, the trial court denied defense counsel's request to introduce Dr. Shields's report, which concluded that although [petitioner] was not psychotic, his "description of the events just prior to and during the instant offense [were] congruent with the mental status changes that would be expected in one who [w]as assaulted and who took blows to the head which resulted in loss of consciousness.... [¶] ... His description of events suggest that the combination of post-traumatic, and post-loss-of-consciousness, mental status impairment was present at the time of the instant offense." Defense counsel argued that, in light of the prosecutor's reference to Dr. Shields's report during cross-examination of [petitioner], it was proper to admit the entire report.
>
> The second instance involved the trial court's refusal to allow [petitioner] to answer a juror's written question following his testimony, which asked: " 'Has a doctor ever given you a diagnosis of a mental illness? If so, what mental illness?' " In the third instance, the trial court excluded Dr. Cloutier's proffered testimony that [petitioner's] struggle with the officers was the result of "a dual combination, his altered mental state coupled with his unconsciousness." The fourth occasion involved the trial court's refusal to allow Dr. Cloutier to answer [] follow-up questions posed by the jury. . . .

People v. Jackson, 2010 WL 323074 at *6 (footnote omitted).

Petitioner argues that the trial court violated his right to present a full defense when it "excluded expert testimony establishing that [petitioner] was legally unconscious." (Petition at 6.) The Court of Appeal rejected this claim on the ground that evidence of mental illness is irrelevant in prosecutions involving general intent crimes such as the crimes underlying petitioner's conviction, i.e., assault and resisting an executive officer. As the Court of Appeal explained:

> "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456-457; see also *People v. Sargent* (1999) 19 Cal.4th 1206, 1215 [general intent crime is one where no further mental state beyond willing commission of act proscribed is required].) It is sufficient in general intent crimes that the defendant intentionally completes the act declared to be a crime. (*People v. Cole*

9

(2007) 156 Cal.App.4th 452, 477.)

. . .

[T]he rule has developed that evidence of mental illness may be offered to show the absence of specific intent but not to prove the absence of general intent. [Citations.]" (*People v. Gutierrez, supra*, 180 Cal.App.3d at p. 1082.)

People v. Jackson, 2010 WL 323074 at *7-8.

The Court of Appeal first noted that, under California law, assault on a peace officer is a general intent crime, citing People v. Williams, 26 Cal. 4th 779 (2001) and People v. Jefferson, 119 Cal. App. 4th 508 (2004). People v. Jackson, 2010 WL 323074 at *8. The Court of Appeal went on to analyze the offense of resisting an executive officer under Penal Code § 69:

> Section 69 renders criminally culpable every person "who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed ... by law, *or* who knowingly resists, by the use of force or violence, [an executive] officer, in the performance of his duty...." (Italics added.) As demonstrated by the italicized language, section 69 "sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty. [Citation.]" ( *In re Manuel G.* (1997) 16 Cal.4th 805, 814.)
>
> Here, [petitioner] was charged with and convicted of the second way of violating section 69, the resistance prong, . . . .
>
> The definition of the resistance offense of section 69 consists only of a description of the act of resisting an executive officer, without reference to an intent to do a further act or achieve a further consequence. (See § 69; *People v. Hood, supra*, 1 Cal.3d at pp. 456-457.) Accordingly, the resistance offense would appear to be a general intent crime (see, e.g., *People v. Roberts* (1982) 131 Cal.App.3d Supp. 1, 8-9 ( *Roberts* )), which would render the evidence of defendant's mental illness irrelevant.

People v. Jackson, 2010 WL 323074 at *10.

The Court of Appeal concluded:

> [N]either the offense of assaulting a peace officer (§ 245, subd. (d)(2)) nor the offense of resisting an executive officer as set forth in the second clause of section 69 includes a requisite mental state that is akin to "specific intent" for purposes of admissibility of mental illness evidence.

10

People v. Jackson, 2010 WL 323074 at *11.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process. Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Jammal, 926 F.2d at 919. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated. Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983).

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence). "[T]he introduction of relevant evidence can be limited by the State for a valid reason." Id. at 53 (internal quotes and citation omitted). But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. Holmes, 547 U.S. at 324. Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was critical to the defense. Chambers v. Mississippi, 410 U.S. 284, 302 (1973). "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013).

The California Court of Appeal found that excluding some evidence of petitioner's mental state was proper under California law. The appellate court's finding in that regard is binding on this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged

11

conviction, binds a federal court sitting in habeas corpus"). This Court may not second-guess the state court's conclusion that, under state law: (1) the underlying crimes are general intent crimes; and (2) evidence of mental illness may not be offered to prove the absence of general intent. The question before this Court, as described above, is whether the trial court's exclusion of this evidence precluded petitioner from presenting his defense and rendered his trial fundamentally unfair.

      Petitioner has failed to demonstrate an error of constitutional magnitude. Specifically, the excluded evidence was not critical to the defense because, as noted by the Court of Appeal, even without the excluded evidence, petitioner "presented extensive evidence on the issue of unconsciousness." People v. Jackson, 2010 WL 323074 at *12. For instance, while Dr. Shields's report was excluded, Dr. Cloutier testified that "Dr. Shields stated that [petitioner's] behavior on July 19, 2004, 'was consistent with post-head-injury, mental-state changes.'" Id. Further, Dr. Cloutier offered substantial expert testimony on petitioner's mental disorder, including his "opinion that [petitioner's] behavior was consistent with [petitioner] having suffered an altered mental state based on a perceived loss of consciousness." Id. at *13. (See also Ex. B at 1044-94.) In addition, as noted above, the jury heard testimony about petitioner's good character, including (1) his normal, easygoing demeanor; (2) the fact that he had been a good student and had never been in trouble; and (3) the fact that he worked in law enforcement. This was presented alongside testimony that, on the day in question, petitioner was not his normal self, including (1) petitioner's testimony that he had lost consciousness four or five times on the day of the incident; (2) petitioner's testimony that he had little memory of the incident; (3) the testimony of a friend and colleague that petitioner had been slurring his words and seemed tired that day; and (4) the testimony of a responding officer that petitioner was "acting different" and urinated and defecated on himself during the struggle. In sum, the exclusion of two pieces of expert evidence did not deprive petitioner of the opportunity to present his defense that he was "unconscious" at the time he committed the charged acts.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2.      Firefighter as "Executive Officer"

Petitioner claims "[t]he conviction under [Penal Code] 69 violates the Fourteenth Amendment because the statute does not apply to firefighters who were not performing a duty or [giving] a verbal order." (Petition at 6.)

The Court of Appeal summarized and rejected this claim as follows:

[Petitioner] contends that Bennett, as a fire captain, was not an "executive officer" within the meaning of section 69 because the statute fails to list the term " 'firefighter' as a protected category...." According to [petitioner], this omission is "significant," in that the Legislature has expressly included firefighters in other instances. [Petitioner] asserts that "[i]f the ... [L]egislature [had] intended to extend the reach of section 69 to firefighters, it could easily have added the word 'firefighter' to section 69 as it did to section 245, subdivision (d)," which expressly criminalizes any assault "upon the person of a peace officer or firefighter."

If we were to accept [petitioner's] interpretation, we would be effectively writing the term "executive officer" out of the statute. (See *In re Manuel G., supra,* 16 Cal.4th at p. 819.) Contrary to [petitioner's] argument, section 69 lists no "protected category" of persons who are within the ambit of its statutory protection. Rather, section 69 criminalizes obstructing or resisting an "executive officer" in the performance of his or her duty. Although section 69 does not define "executive officer," this term has long been interpreted as including police officers at all governmental levels as a matter of law. (See *In re Manuel G., supra,* 16 Cal.4th at pp. 818-819; *People v. Markham* (1883) 64 Cal. 157, 158-159 [interpreting section 68]; *People v. Mathews* (1954) 124 Cal.App.2d 67, 68-70 [interpreting section 67]; *People v. Kerns* (1935) 9 Cal.App.2d 72, 73-75 [interpreting section 68].)

Following [petitioner's] interpretation, however, section 69 would not extend to police officers since they are not expressly listed by name in that statute. Such an interpretation would be contrary to the apparent purpose of that section, which "is designed to protect a police officer (who is an executive officer) against violent interference with the performance of his duties...." (*People v. Buice* (1964) 230 Cal.App.2d 324, 336.)

[Petitioner] nevertheless insists that since firefighters are not trained or authorized to enforce the law, they are not included in section 69. In support of this assertion, [petitioner] relies on CALJIC No. 7.50 for the proposition that an "executive officer" is an individual who has "the responsibility of enforcing the law." [Petitioner's] argument notwithstanding neither section 69 nor CALJIC No. 7.50 is limited to law enforcement officers. The version of CALJIC No. 7.50 given to the jury in the instant case provides, in part, as follows: "An 'executive officer' is a public employee whose lawful activities are in the exercise of a part of the sovereign power of the governmental entity employer, and whose duties are discretionary, in whole or in part. Any employee charged with the

13

>responsibility of enforcing the law is an executive officer."
>
>Moreover, the term "executive officer," has been interpreted to include numerous public employees who are not otherwise engaged in law enforcement. As the California Supreme Court has observed: "Indeed, the term 'executive officer' as used in section 69 ... extends to other executive officers who would have no occasion to engage in the execution of court process or similar duties.... (E.g., *People v. Superior Court (Anderson)* [ (1984) ] 151 Cal.App .3d 893, 895 [threat to kill mayor is sufficient to support charge of violating section 69]; see also *People v. Kerns* [, *supra,*] 9 Cal.App.2d [at pp.] 73-75 ... [junior epidemiologist-bacteriologist employed by State Board of Public Health to perform inspections of aviaries is 'executive officer' within the meaning of section 68, prohibiting bribery of such officers]; Gov.Code, § 1001 [defining 'civil executive officers' to include numerous public employees not engaged in law enforcement].)" (*In re Manuel G., supra,* 16 Cal.4th at pp. 818-819.)

People v. Jackson, 2010 WL 323074 at *13-14.

To the extent petitioner challenges the Court of Appeal's interpretation of Penal Code § 69, the claim fails. As discussed above "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw, 546 U.S. at 76. Here, petitioner does not refer to any federal law or constitutional provision with respect to his claim. Instead, petitioner alleges error under state law only. "[It] is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (holding federal courts are "bound by a state court's construction of its own penal statutes").

To the extent petitioner is arguing that there was insufficient evidence to establish (1) that petitioner was resisting Bennett, or (2) that Bennett was performing the duty of a firefighter, the claim also fails.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have

14

led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324. For purposes of determining such claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Where the record supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Id. at 326. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. Id. at 324.

On direct appeal, petitioner argued that: (1) "Captain Bennett did not give [petitioner] any order or instruction that [petitioner] resisted or with which he failed to comply"; and (2) "Captain Bennett was not performing any duty at the time of the struggle." (Ex. C at 38.) The Court of Appeal rejected these arguments as follows:

> In the instant case, [petitioner] argues that Bennett made a "personal decision to become involved in a physical struggle," which "was outside ... the scope of any duty he had as a firefighter." We disagree. A firefighter's duties are not as limited as [petitioner] suggests. Indeed, "[m]embers of an organized fire department have the powers of peace officers while engaged in the performance of their duties with respect to the prevention and suppression of fires and the protection and preservation of life and property against the hazards of fire and conflagration. [Citation.]" (*Romero v. Superior Court* (1968) 266 Cal.App.2d 714, 721-722.) Moreover, it is well established that firefighters, in the course of responding to an emergency, may seize contraband that is in plain view. (See, e.g., *Michigan v. Tyler* (1978) 436 U.S. 499, 509 [once in building to extinguishing blaze, firefighters may seize arson evidence in plain view]; *People v. Ramsey* (1969) 272 Cal.App.2d 302, 311 [warrantless entry by firefighters responding to apparent emergency justified]; *Romero v. Superior Court, supra,* 266 Cal.App.2d at pp. 717-722 [firefighters at scene of residential explosion entitled to seize contraband in plain view]; see also *People v. Roberts* (1956) 47 Cal.2d 374, 377, 379 [conducting reasonable search police officers "did not did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered"].) Thus, while Bennett was responding to a medical emergency, much like a firefighter extinguishing a blaze or determining the cause of an explosion, he was under no obligation to blind himself to criminal behavior taking place. In other words, even if joining in the physical struggle was disconnected with the original dispatch, Bennett was justified in rendering assistance to the police officers who were involved in a physical struggle with the possible subject of the medical emergency.

15

> The focus of the prohibition against resisting an executive officer is not to protect the offender from the consequences of his or her own conduct, but to protect the executive officer from interference with the performance of his or her duties. (See *People v. Pacheco, supra,* 263 Cal.App.2d at p. 558; *People v. Buice, supra,* 230 Cal.App.2d at p. 336.) We conclude there was substantial evidence that Bennett was an executive officer performing a duty and that [petitioner] forcefully interfered with such performance.

People v. Jackson, 2010 WL 323074 at *14-15.

Based on an independent review of the record, the state court's denial of this claim was objectively reasonable. The evidence adduced at trial shows: (1) Bennett's duties included responding to 911 calls, which he did in this situation (Ex. B at 345-46); (2) when he arrived at the scene, he observed petitioner lunge toward Officer Donofrio's firearm (id. at 351, 373-76); (3) Bennett intervened to protect Officer Donofrio (id. at 351, 378-79, 387, 427); (4) although Bennett did not give a verbal command, he attempted to pry the gun out of petitioner's hand, and petitioner continued to hold onto the gun (id. at 383-84). Further, Bennet testified that, as firefighters, "we're told we have to get control of the situation." (Id. at 443.) Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that: (1) Bennett's efforts to remove the gun from petitioner's hand constituted an order, with which petitioner refused to comply; and (2) Bennett was performing the duty of an executive officer at the time of the incident.

Accordingly, petitioner is not entitled to habeas relief on this claim.

C.   Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

16

is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute William Knipp on the docket as the respondent in this action.

**IT IS SO ORDERED**.

Dated:  September 22, 2013

_____
JON S. TIGAR
United States District Judge

17